Council please proceed when ready. Thank you Your Honor. Good morning. Good morning. May it please the court. I'm John Minster. I'm co-counsel for the estate of Jim Slater and his family and I want you to know that with me in court is my co- counsel Ms. Ann Taney, my client plaintiff Laura Casablanca, the widow of Jim Slater's estate, also plaintiff Jerry Slater, third row, Jim's brother, the personal representative of his father's estate, and finally Don Hamilton, Jim's stepdaughter. Also with us today is Amanda Verona, our court reporter in the We ask that the court's decision contain the following elements. First, we ask you to rule that under plaintiff's facts the killing of Jim Slater was unreasonable and violated the Fourth Amendment. Second, we ask you to rule that Mr. Slater's intent not to be killed under these circumstances was clearly established. The law gave a reasonable officer sufficient notice that this killing is unlawful. Jim can't tell us what happens in those circumstances. The circuit has told us that the court can consider all the circumstances including circumstantial evidence which it believed would tend to discredit the story told by the police. So we have the following facts from the evidence. Jim Slater was unarmed when the deputy killed him. It's undisputed that Deputy Knife was left on the bench and under our facts. Counsel, where in the record can we find the fact that the officer who shot was advised that that there was no longer a weapon on the victim? Deputy Harden testified of that. I'm sure it's in the excerpt of record and... Could you tell us where? Maybe when you come back for rebuttal. We'll get that for you, but he says... Before the shooting, too. Before the shooting, he says, I can't see the knife anymore. This is down, when this happens is the two officers are down in their squad cars on the Woodinville Duval Road and Deputy Harden tells him, I can't, he had a knife, I can't see it anymore. Would you agree that there's a difference between saying I can't see a knife and saying he doesn't have a knife? If I said he said he doesn't have a knife, then I misspoke. He told him that he that he had a knife and he could no longer see it. And I think that's important because... Well, it's undisputed, though, also, though, that he had been seen previously with a knife and that Mr. Slater was wounded or, you know, that he was bloody, right? And discussions of suicide. Well, the... I know Deputy Harden expresses the opinion over the radio that we may have a suicide. All right, but is it undisputed that he... Well, there was a knife on the bench, obviously, after the... that was determined after, but before, is it undisputed that he had a... What was the call for? You know what, I think it was not determined that the knife was discovered only afterwards. Under our facts, the knife was visible on the bench. The shooter testified that he could see the bench before he shot Mr. Slater. And under our facts, he could see the knife. Furthermore, if you talk... Excuse me, counsel. Sure. Where in the bench? Where is that in the record? We have that in the Slater family supplemental excerpt of record. We have the affidavit. So that's an affidavit from one of the experts? No, it's an affidavit from the owner, the nurse, who's the owner of the property, who says that she... What happened is the police tried to do a reenactment after we introduced evidence that you can see the knife. So they do a reenactment of the pictures, and she stands in the same place that they're saying the shooter stood in. She says she can see the bench. She can see the knife. But that's after the fact as well, right? So you ask a nurse who owned the property to, after the fact, say whether or not a knife could be seen from that? Well, they put a knife on the bench, and she looks at it from the same point of view that the shooter is claiming that he stood in both in 2009, and then again in 2011. When was that reenactment? You know, I don't have the county's reenactment. When was the reenactment that you're referring to where the person who owned the property looked at the bench and said that the knife could be seen? We'll get that date for you, but it's in the Slater family supplemental excerpts of the nurse who's the owner of the property. She also says, of course, that the bench is in the same position, that the bench tilts downward. So it's not a flat bench. This bench tilts downward, so if there's an object on the bench, you can see that object. The shooter admitted that he could see the bench at the time. And when we talk about a reasonable officer, if you're told that at some point the victim had a knife, you see that he's half-naked. He's just got shorts and sandals on. You see him sitting on a bench. You see he's got bloody wrists, and you don't see a knife. The shooter never was there about two minutes. He never sees a knife. But does that rule out any other weapons? There are no other weapons in play. The county tries to make it look like that in their briefing, but the Deputy Hardin met with my client, Laura Casablanca, beforehand, and she told him beforehand, before the shooting, that she had, that there had been a gun in the house, and she put it in the trunk of her car. And that also is... How about other knives? He had a kitchen knife. So were all the kitchen knives accounted for? She said she had collected the knives and put them in the trunk of her car. There are no, there's no other weapon in play here. The county attempts in their brief to insinuate that there was, but that's a red herring that's being dragged across your path. There's no other weapon in play, and the police don't really claim that either. They, the stuff about another weapon is a last-ditch thing that they did in their brief when they admitted that it was possible the shooter could see the bench, and they admitted that perhaps it was unreasonable, that the jury could find it was unreasonable for the shooter to think that he had a knife. So they said, well, maybe he could, maybe he had other weapons. And I suppose there's no limit to the imagination a police officer could have, but we're dealing with the Fourth Amendment. We're not dealing with uh, shooter says he can't see anything. Uh, you know, reasonable officer, getting back to that, if I would think that if you're on the scene and you see a half naked guy sitting on a bench and you don't see the knife anymore, and you told that he did have a knife and he gets up, he's walking and you can't see a knife in his hands. Well, the officer is also saying that he won't show him his hands, right? The officer is asking to see his hands, and they say that there's bushes in the area too, right? I mean, it's a, it's a foliage, there's foliage, correct? All of that, all that's disputed. The story about the foliage, actually, uh, in the, in the 2009 testimony, they said, uh, there was a bush. Uh, the county's brief later says there was a row of bushes and we moved to strike that portion of the county's brief because it's a false recitation of what the facts are. Uh, furthermore, um, whether they gave him any commands at all is a disputed fact. There's, uh, if you look at the diagram, it's ER 336, which I think is very illuminating. Uh, you'll see that the officer had to walk some distance from the Woodinville Duval Road up to the spot where he claims he supposedly crossed 50 feet from the bench of the road, relatively, you know, cross that distance. How could a jury could ask, uh, the officer cover that distance, shout commands at Mr Slater and then reach the conclusion that he's ignoring those commands all within 18 seconds. It can't be done, Your Honor. I, I shouldn't say that. A jury could find that the story about giving commands, uh, was a story that was given later because under King County policy, if you say that you gave the person commands, they had 15 homicides where the officers killed people after they allegedly did not obey commands. And that's in the Bob report, which is in the municipal liability section of our brief. Uh, looks like I've got four minutes and 30 seconds left. Uh, I will, I'm going to invade a few more minutes and then reserve the rest for rebuttal. Um, why would Mr Slater try to conceal something with one hand and not the other if his hand was in fact empty? And that's the viewpoint that were assisted. This court has the a letter on Sunday. Um, why would he walk towards the police that week? We dispute that claim. He was walking towards the road. You know, if you visualize this as a triangle, the police were at the top of the triangle. There's a hypotenuse over to where Jim is. You need to stay at the lectern so that you could be heard. Sorry. Jim's over on the bench. Jim walks towards the road. The police come up and cause the contact. He doesn't, he never walks towards the police under our facts and under the police's diagrams. The shooter could have backed up. The diagram er 33 36 is clear. There's no backing up. Um, yeah. Judge Callahan, you asked about clearly established law. We cited five cases. One of them is a case ting versus United States 9 27 Fed second 15 oh four where this circuit held in 1991. The deadly force is unreasonable where the suspect had dropped his gun here under our facts. Mr Slater had dropped his gun. The fact that the police knew it, you're not, uh, neither officer Harden or officer Coogan said they knew it right before Coogan admits that he could see the bench. We're not talking about what's in Coogan's mind because we're not prosecuting a murder case here. What would a reasonable officer do? A half naked guy get up from the bench and he doesn't see a knife anymore. You look at the bench to see if the knife's there or not. Well, I think Coogan said that he was paying attention to Mr Slater that as Mr Slater was approaching him. That's what he said, right? As opposed to he wanted to focus. I mean, what a reasonable officer focus on the bench or would you focus on someone that was approaching you that you thought might be armed? How long does it take to look at a bench? Half a second. He'd look at the bench because he doesn't see a knife in his hands. He would look at the bench any up. We would argue to the jury that any officer, any reasonable officer, any reasonable officer would look at the bench to see if that's where the knife is. How long does it take to look at it? Uh, we do not credit. Let me be clear that we do not credit his testimony and we don't think the jury will either. Okay, I've got a minute and a half left. I'll reserve the rest for rebuttal. Thank you so much counsel. Okay. Good morning. Good morning. May it please the court. My name is Jessica Cosmo and along with my co counsel Cindy Port. We represent the appellee defendants, King County and Deputy Peter Coogan on July 4th. Are you taking all the time? Yes, Your Honor. Thank you for for asking. On July 4th 2009 James Slater forced Deputy Coogan to make a split second decision. The split second decision Deputy Coogan made was to defend himself against a man who he believed was armed with a knife, who was bloody, suicidal, advancing toward him while refusing to obey commands. The events surrounding Mr Slater shooting happened over 18 seconds. And as Mr Slater was coming towards Deputy Coogan, Deputy Coogan had no more than 12 ft of Mr Slater's movements to analyze the situation and decide what to do. Well, I think one of the things that obviously that in in this sort of situation, because Mr Slater is deceased, you know, in some situations the person that shot is not deceased. And so there can be other accounts of what occurred. But here the officers, there's there's only their account. And then, but I think counsel for Mr Slater has indicated that that they did certain diagrams and all of that. And I think when a person's deceased, we have to look to everything in the record to see if there's all the circumstances to see if there's some other way that it could be looked at. Right. We have to do a little more searching view because we only have one one side's account. Absolutely, Your Honor. And the case law is clear on that, that when when there are no other living witnesses other than the officers, it is the court's duty to examine all of the evidence to determine whether or not the officer's account is internally consistent. And is there any circumstantial evidence that could tend to discredit the officer's testimony here? To the contrary, you have direct evidence that corroborates the deputy's account of this incident. And I will, I wanted to you were asking counsel about whether or not Deputy Coogan could see the knife on the bench from his shooting location. So after typically opposing counsel said there was evidence in the record to reflect that, um, the officer could see the knife on the bench. And that's actually incorrect. Your Honor. The deputy Coogan testified in his deposition and this is at er 89. He said, quote, Mr Slater was at a slight incline from us. So we were actually looking up at him. And even after the shooting, the bench, the top of the bench was out of my line of sight. And plaintiff's counsel reference references a declaration from the property owner, Beverly Ison, who went back out to the property, what's her property and was out there on July 25th of 2013. And that's the Slater family supplemental excerpts of record at four. Beverly Ison says that she stood at the placard marked five and that she could see a knife sitting on the bench. Placard five was not deputy Coogan's firing location. That location was actually placard B. So respectfully, this declaration from Miss Ison doesn't prove anything at all. It certainly doesn't prove that in those circumstances that Deputy Coogan was faced with and which is the the way that this incident is to be analyzed. The perspective of a reasonable officer on the scene standing in the shoes of Deputy Coogan. What in terms of in, you know, obviously Mr Slater didn't have the knife. Um, and it was on the Mr Slater in terms of his injuries and a knife. And then when it was when it became evident later that the knife was on the bench, did did Mr Slater have injuries on his wrists or what was the what? How does that work out in terms of the evidence? Yes, your honor. And again, analyzing the facts that were known to Deputy Coogan as opposed to some additional facts that were known by Deputy Harden, who was the first arriving deputy on the scene. Deputy Coogan heard the radio transmissions in route to the scene. He heard that Mr Slater had gone back into the home where he had access to weapons, including guns. Now, plaintiffs counsel said, Miss Casablanca, Mr Slater's wife said disputes that. But what Deputy Coogan heard is undisputed. The radio transmission said he has access to weapons, including guns. He then hears Deputy Harden radio that Mr Slater is on a bench and he's holding a knife and that he's bloody and refusing all commands. So when Deputy Coogan got to the scene, that was the information that that he knew. And when Deputy Coogan got to the scene, the deputies decided that their best course of action was to wait for backup that they knew was on the way. Over two minutes passed between Deputy Coogan's arrival and the time that Mr Slater got up from the bench. And in the prior argument, uh, your honors focused on, uh, what is the clearly established law, which is, of course, the issue that we have to focus on here. Deputy Coogan is entitled to qualified immunity as long as it was not clearly established that his actions were unlawful in these circumstances. And I think that Deputy Coogan's own testimony recognizes where that line was. He testified that when he arrived at the scene and Mr Slater was up on the bench where you could no longer see the knife, but it had been reported that he'd been on on the bench with the knife earlier. He's sitting on the bench. The deputies could not see his hand, whether or not anything was in his hands at that point, but he was bloody. The deputies decided to wait for backup. He was a threat at that point because there were residences in the area and he had been in possession of a weapon, but the threat was not imminent. And it wasn't until Mr Slater got up from the bench that the circumstances of this incident changed that the deputies were forced to react by the circumstances caused by Mr Slater. This isn't a case where the officers own actions escalated the confrontation. Now, um, your council for the appellant said that Deputy Harden said there's no knife. What information is there prior to the shooting about? Did Deputy Harden say that to Deputy Coogan before? What are Deputy Harden? What? What's the evidence in the record that we have to look at? The evidence is that Deputy Harden told Deputy Coogan that Mr Slater had been in possession of a knife, but he could no longer see the knife. It is also undisputed that neither deputy saw Mr Slater get up from the bench. The deputies were conferring, strategizing that they and formulating their plan, which was to wait for backup that was on the way they were gloving up. Mr Slater was bloody. So in case they had to go hands on with him, so they were preparing for that. But they knew that backup was on the way so that they with additional officers that he could either surrender or that there would be additional officers if they had. Was there a switch from a handgun to a rifle? Or was there any change there on? Did did Deputy Coogan changes weapon or what was his weapon? No, he he had the rifle. Deputy Harden, who was the initial contact officer, had his handgun and Deputy Coogan had a rifle and that decision was made because of the distance that Mr Slater was from the deputies and the fact that this was a residential area. So Deputy Coogan chose his patrol rifle due to the accuracy of that weapon in case it did need to be used. And once Mr Slater got up from the bench, it's those circumstances that happened in the 18 seconds. And I think it's important to note that even as Mr Slater as Deputy Coogan and Mr Slater first had an obstructed view of each other, that even then, Deputy Coogan didn't use deadly force. At that point, he raised his rifle and commanded to Mr Slater, get on the ground, show me your hands, get on the ground. And Mr Slater kept advancing. Deputy Harden was also repeatedly commanding Mr Slater to get on the ground, but he kept coming. And at the point when Mr Slater was approximately eight ft from Deputy Coogan was when Deputy Coogan fired his now, a council for the appellant said that that is internally consistent and inaccurate in light of other evidence presented. What's your response to that? And quite quite respectfully, Your Honor, I'm not aware of the of the other of the other evidence that would make that internally inconsistent or circumstantial evidence that would tend to to discredit either deputies account of this incident. The 18 seconds that the they can dispute the pace and manner with which Mr Slater came towards Deputy Coogan. But they seem to be doing that with only argument and not evidence. What can't be disputed is the short time frame over which these this incident occurred and the distance over which it occurred. I think the district court, though, said that, uh, the Deputy Coogan violated a constitutional right, but it wasn't clearly established. And so he gets qualified immunity or what. Do you agree with that? I absolutely do not agree with that, Your Honor. And I think what the district court said was, uh, the district court gave Deputy Coogan qualified immunity under the second or the clearly established prong, but found  of law that Deputy Coogan's actions were objectively reasonable. We submit that the undisputed evidence in this case supports a finding of qualified immunity on either prong on that is fully set forth in our briefing. However, I've chosen to focus my argument today on the clearly established prong. As this court is well aware, it can affirm on any basis, and we think it's entirely appropriate for the summary judgment to be affirmed on the clearly established prong because a reasonable officer standing in the position of Deputy Coogan would not have known that it was unlawful for him to use deadly force. The is there clearly established case law that would have put Deputy Coogan's? The question is, was it beyond debate that Deputy Coogan could not use deadly force in those circumstances as someone is a disputedly been in possession of a weapon just seconds before and is coming towards him, refusing to obey commands and walking in a manner where his Deputy Coogan cannot see what is in Mr Slater's palms. Is there any dispute that the decedent was suicidal? Uh, it's not disputed because it was. And certainly, uh, it's not disputed that that fact was broadcast to Deputy Coogan in route to the scene. And that's in the in the radio transmission that is, uh, S. E. R. 3 86 to 3 92. The, uh, the actions of Deputy Coogan, as this court is well aware, are analyzed from the perspective of a reasonable officer on the scene and without the benefit of 2020 hindsight. Officers, as we well know, are forced to that are tense, uncertain and rapidly evolving. And that's exactly what this was. Initially, when Mr Slater was sitting on the bench, the circumstances were different, and the deputies did not use deadly force. At that point, they didn't use any force at all. They showed restraint. They were waiting for backup. And when Mr Slater got up off the bench, that's when things changed and Deputy Coogan was forced to react. It is not clearly established that an physician would have known that his actions were unlawful. And for those reasons, we ask that the district court's grant of summary judgment be affirmed. Unless the panel has other questions for me, the arguments are set forth fully regarding the dismissal plaintiffs, other claims, their municipal liability claims and, uh, the 14th Amendment claims, which also would fall under the qualified immunity analysis. We ask that the district court's order be affirmed in in its entirety. Thank you. Thank you, Counsel. Bottle. Thank you, Your Honor. I have some record information for you. The opposing counsel gave us the reference to the Slater family S. E. R. Four. So we have that already. This pertains to what you were asking me about, which I promised I would get you. Um, er 33. The defendant's answer says, quote, defendants admit that after arriving at the scene, Deputy Harden told Deputy Coogan that he could no longer see the knife on the transcript. Um, of Deputy Coogan's deposition. Two very important pages on this issue of the bench and the knife. E. R. 89 and E. R. 90. Uh, Deputy Coogan, the told me Mr Slater was holding the knife on the bench, and that was the last he had seen it. He then goes on to testify. This is on 89 E. R. 89 from where Deputy Harden's vehicle was parked. And from where I shot Mr Slater, I could see the bench, but I never went up to the bench. Right. Then later on, starting at line 16, it says, Okay, could you see from where you fired the shots? Could you see the seat of the bench? In other words, where the person sits? He said, I don't know. I was directed at watching Mr Slater. The bench was not in my view. Take a look at the next page. Take a look at page 90. I ask him, was the bench was the bench was of interest to you because he was told sitting on the bench? Yes. When you got there, he was sitting on the bench. Yes. When he was sitting on the bench, do you see him holding a knife? I did not. His hands, as far as you could tell, were empty. Question answer at that point in time. Yes. Uh, then I, uh, say he starts walking answer. Yes. And I say, after he starts walking, do you look at the bench to see if the knife is there? He answers again. My attention was directed Mr Slater, not the bench. All right now, he never sees a knife. The shooter never sees a knife period ever. So the only information that he has about the knife is from Deputy Harden, who said, who you can't justify the killing of a human being because the deputy, this individual deputy chose to at least assert in later testimony that he was focused on Mr Slater rather than the bench. A jury could conclude, uh, and I believe the district court did that, that his assertion that he could not see the knife on the bench is a material disputed fact, and they could find that he could see the knife on the bench. All right, counsel, you could see that your time. We understand your position. The case just argued is submitted for a decision by the court. That is our final case on calendar. We stand in recess until nine a.m. Tomorrow morning. Thank you, Your honors. All right, this court for this mhm.
judges: Fernandez, Rawlinson, Callahan